Filed 4/27/22  P. v. Gonzalez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060374 |
| v. | (Super. Ct. No. C1634801) |
| BALAM EUGENIO GONZALEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Santa Clara County, Julia L. Alloggiamento, Judge.  Affirmed as modified.

Robert J. Beles, Paul McCarthy, Law Offices of Beles & Beles, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Donna M. Provenzano and Jalem Z. Peguero, Deputy Attorneys General, for Plaintiff and Respondent.

This case concerns three separate gang drive-by shootings that took place in San Jose in 2012 and 2013. Based on his involvement, a jury convicted Balam Eugenio Gonzalez of the first degree murders of Pedro Cortez and Armando Heredia (Pen. Code, §§ 187, 189)[1] and the attempted premeditated murder of Brian Joya (§§ 187, 189, 664). The jury found true multiple firearm enhancements (§§ 12022.53, subds. (d), (e)(1), (g)), gang enhancements (§ 186.22, subd. (b)(1)(C), (5)), and special circumstances (§ 190.2, subd. (a)(3), (21), (22)). The trial court imposed sentences of life without the possibility of parole for the two murders, a consecutive life term for the attempted premeditated murder, plus 80 years to life for the firearm enhancements and a prior serious felony enhancement.[2]

On appeal, Gonzalez contends: (1) the trial court erred by failing to declare a mistrial after witness Ramon Lomeli testified Gonzalez was involved in an uncharged shooting; (2) the court abused its discretion by permitting Lomeli to testify as a gang expert; (3) there was sufficient evidence Lomeli was an accomplice to the murder of Heredia; and therefore, the court erred by failing to instruct sua sponte on accomplice testimony (CALCRIM No. 334); (4) the court erred by admitting statements Gonzalez's sister (Sister) made to the police because her statements were coerced and involuntary; (5) the cumulative effect of the court's evidentiary and instructional errors was prejudicial and violated his right to a fair trial; and (6) the court erred by ordering him to reimburse the costs of his appointed counsel. We requested the parties submit supplemental briefing on the impact of Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Stats. 2020, ch. 92) (AB 1869) on Gonzalez's last contention and a criminal justice

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

[2]     In a bifurcated trial, the court found true the allegation Gonzalez was previously convicted of a serious felony (§ 667, subd. (a)(1)). This enhancement applied only to count 1 because the prior serious felony conviction occurred after the commission of the other offenses. (*People v. Rojas* (1988) 206 Cal.App.3d 795, 797, 802.)

administration fee imposed at sentencing.  We also requested the parties address whether correction of the abstract of judgment was necessary.  We agree with the parties AB 1869 requires we vacate the unpaid portions of the appointed counsel costs and the criminal justice administration fee.

While this appeal was pending, the Legislature enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699), known as the STEP Forward Act of 2021 (AB 333).  This legislation, among other things, added section 1109, which requires gang enhancements be bifurcated from the underlying charges at defense request.  (Stats. 2021, ch. 699, § 5.)  In supplemental briefing, Gonzalez contends section 1109's bifurcation provisions apply retroactively to his case and require the reversal of his convictions and gang enhancements.  We need not and do not decide whether section 1109 applies retroactively to nonfinal decisions because, regardless, the failure to bifurcate the gang evidence was harmless.

We vacate the balances on the costs of Gonzalez's appointed counsel and the criminal justice administration fee that remain unpaid as of July 1, 2021.  We direct the trial court to amend the abstract of judgment to reflect this and to correct a clerical error.  In all other respects, we affirm the judgment.

FACTS

I. *Attempted Murder of Joya*

In August 2012, Joya was walking with a group of friends on San Jose Avenue when he heard a noise that sounded like a firecracker and felt a sting on his leg.  The sting was a bullet penetrating his right thigh.  Unable to walk on his own, Joya's friends assisted him to a nearby house.  The shooting occurred within the territory of West Side Mob, a subset of the Norteño gang.

One of the police officers who responded to the scene found two .45 caliber spent shell casings in the street.  On the sidewalk, he found a fired bullet and a bullet's copper jacketing.

Video from a nearby surveillance camera showed a white Mitsubishi Eclipse with a unique black bra on the hood at the intersection of San Jose Avenue and Little Orchard Street when the shooting occurred. The video revealed the car made a U-turn on Little Orchard Street before driving back toward Joya and his group on San Jose Avenue.

II. *Murder of Heredia*

About five days later, Heredia and Erik Velasquez were near the intersection of King Road and Burdette Drive in San Jose. Heredia was on a scooter, and Velasquez was on a skateboard. As they were traveling down Burdette Drive, Velasquez heard a bang. He looked back and saw Heredia on the ground. Velasquez helped Heredia to the front of a nearby store, where Heredia collapsed. Velasquez called 911 before running away.

K. Le was standing outside a nearby sports bar when he heard loud bangs that sounded like gunshots. He saw a white Eclipse accelerating down the street, but he did not see a black bra on the car's hood. Although the car's driver's side window was up, Le saw the driver was wearing a red and white hat, but he was unable to identify the driver.

The police department's homicide crime scene unit responded and found three shell casings and a bullet's copper jacketing near where Heredia was shot. They also recovered one fired bullet that night and a second the next day.

Heredia died from multiple gunshot wounds. The intersection where he was shot was in the territory of Varrio Meadowfair, a subset of the Norteño gang.

III. *Two Shootings Connected*

Police investigation connected the two shootings. The same gun was used in both shootings, and a white Eclipse was present at both.

4

Gonzalez drove a white Eclipse matching the description of the car seen at both shootings. The police seized his car five days after Heredia was killed. The car did not have any bullet holes or broken windows.

IV. *Gonzalez's Police Interview*

About a month after the car was seized by police, Gonzalez was arrested on an unrelated charge. While he was in custody, Detective Sergeant John Barg of the San Jose Police Department interviewed him regarding the Joya shooting. Gonzalez said his sister owned the Eclipse with a bra on the hood, but Gonzalez admitted he drove it.

Gonzalez initially denied being around San Jose Avenue when Joya was shot. After Gonzalez's repeated denials, Barg and his partner used a ruse and told Gonzalez they believed he was in the area and he may have been the victim of a crime; they urged him to tell them what happened because they were after someone else. Eventually Gonzalez admitted he was there when the shooting occurred, but he claimed West Side Mob gang members were shooting at him. Gonzalez said he was driving down San Jose Avenue when he saw a group of about six men. One of them shouted West Side Mob and fired multiple shots at him, shooting out two of the Eclipse's windows. After being shot at but uninjured, Gonzalez made a U-turn and drove back toward the shooter with the intent of running over him. Gonzalez denied shooting at the group and suggested Joya must have been accidently hit by friendly fire from a West Side Mob gang member.

Gonzalez's version of the incident was not supported by the physical evidence. The video recording from the intersection where the shooting took place did not show his car windows were shattered. Nor did the police find shattered glass in the street. Although Gonzalez claimed the shooter emptied the gun's magazine shooting at him, only two shell casings were found, and they were found in the street, not where Gonzalez said the shooter was standing.

5

## V. *Firearm Found and Linked to Multiple Cases*

The day after Barg interviewed Gonzalez, the police conducted a parole search of a residence occupied by two Sureño gang members and found a .45 caliber handgun concealed in a dog food bag in the kitchen. A firearms examiner determined the handgun fired the shell casings collected at the scene of Heredia's homicide and the Joya shooting. The firearm was also linked to several other shootings that occurred while Gonzalez was in custody on unrelated charges.

## VI. *Murder of Cortez*

In November 2013, Cortez, whose nickname was "Moko," was hanging out in Capitol Park with Catarino Licea and Marcos Cuevas. The park was within the territory of Capital Park Locos, a Norteño gang subset. As the three were walking through the park, they heard gunshots. Cortez exclaimed he had been hit. He took a couple of steps and collapsed. He died from a gunshot wound to the chest.

Licea did not see shooter. Cuevas told the police the shots were fired from a shiny, black Charger, Camaro, or similar looking "muscle" car. He saw the car's rear but did not see its occupants.

M. Galvan was driving behind a black Challenger with tinted windows near Capitol Park. The Challenger slowed down, and Galvan heard what sounded like two gunshots. She saw a man in the park collapse. Galvan did not see the car's occupants or a gun pointing out of the car's window.

Later that evening, 13-year-old Z.D. went to a party at the apartment of her friend Pablo, who lived in the same building as Gonzalez and his family. Pablo was a Sureño gang member. Z.D. was with Pablo near the front of the building when a black car with tinted windows pulled up in the driveway. Gonzalez got out of the car and talked to Pablo for a few minutes before going upstairs to his apartment. Gonzalez appeared nervous, was sweating, and walking fast. When Pablo and Z.D. went inside, Pablo told her "his cousin or friend" had just killed a "Buster," which is a derogatory

6

term for a Norteño gang member.  Pablo showed her a picture of the victim on the news and said it was Moko.  He told her more than one person was involved in the shooting.  When questioned by the police, Z.D. said there were two people in the car—the driver and a shooter.

Gonzalez was arrested several days later, driving Sister's white Nissan Altima.  Police seized the Challenger pursuant to a search warrant.

VII.  *Sister's Police Interview*

About 10 days after Cortez was fatally shot, the San Jose police contacted Sister about releasing her Altima to her.  Sister's parents took her to the police station to retrieve the car.  At the station, Detective Sergeant Patrick Guire and Detective Ken Tran interviewed her about Gonzalez's involvement in Cortez's murder.

Initially, Sister tried to create an alibi for her brother.  She told the detectives the day Cortez was shot, she used the Challenger to run errands with her mother and Gonzalez stayed at home.  When pressed by the detectives, she admitted that was not true and she said that to protect her brother.  Eventually, she told them Gonzalez was driving the Challenger the afternoon Cortez was shot.  She said Gonzalez told her three guys tried to shoot him, so he took out a gun and started shooting.  Gonzalez told her he was going to spend the night at someone else's house, because "[T]hey're going to come and look for me."  He left the Challenger and took her Altima.  He told her to "clean" the Challenger and to be careful because there were problems between the Sureños and Norteños.[3]

VIII.  *Forensics*

In December 2013, a crime scene investigator collected gunshot residue from the Challenger's interior.  No residue was detected in the driver's area, but gunshot

---

[3]     At trial, Sister testified she did not remember anything she said during her police interview.  Because Gonzalez challenges the admission of Sister's police interview, we discuss it in more detail *post*.

residue was detected in the front passenger area. Analysis also detected the presence of the element cobalt. The presence of cobalt in the gunshot residue was uncommon; an analyst with the crime laboratory was unaware of any cases where cobalt had been detected in gunshot residue. Cobalt was also found on the two spent projectiles recovered during Cortez's autopsy, further linking the Challenger to his murder.

IX. *Lomeli's Testimony*

Over defense objection, the trial court permitted Lomeli to testify as an expert on the Sureño gang and as a percipient witness concerning Gonzalez's actions and statements after the Heredia and Cortez shootings. At the time of trial, Lomeli was serving a felony sentence on a charge of assault with a deadly weapon and testified under a grant of immunity.

A. *Lomeli's Gang Testimony*

Lomeli was a Sureño gang member from the ages of 14 to 21. He explained the Sureño gang had multiple "hoods" or subsets. He joined the subset Varrio Lokotes Trece (VLT) when he was living in the area of Poco Way. Sureños refer to the subset as both Poco Way and VLT. VLT had about 30 members.

Lomeli testified about the history of the Sureño gang and explained its members associate with the color blue and the number 13. As a Sureño, he was educated about Norteños, their rivals, who associate with the color red and the number 14. Sureños have several derogatory names for Norteños, including "buster." One of VLT's nearest rivals is Capitol Park Locos, and VLT had altercations with them while Lomeli was a member. West Side Mob and Varrio Meadowfair were two other Norteño subsets in San Jose.

Lomeli also discussed the structure of the Sureño gang and its expectations of the neighborhood subsets, including the payment of monthly dues. VLT had regular meetings attended by 15 or so members to discuss general operations in their territory,

8

Norteño incursions, and dues. Every couple of months, VLT would meet with other Sureño neighborhood gangs.

As a Sureño, Lomeli stole over a hundred cars, committed assaults, and perpetrated robberies. Sometimes he stole cars with other Sureño gang members, either members of VLT or other subsets, and they would divide up the profit. He had committed about 20 robberies. He had stabbed seven or eight people, believing some of them were rival Norteños.

Lomeli explained how a Sureño earned respect in the gang and why it was important. Members were expected to engage in acts of violence, and members who killed rival gang members earned more respect. A Sureño would be disciplined if he assaulted or killed a nongang member because such behavior was frowned upon. Lomeli had talked to Sureños who said they killed someone, but he had never been present when a Sureño killed another person. He knew 10 or 15 Sureños who had been killed. When a Norteño kills a Sureño, the Sureño gang members want revenge.

Lomeli described the prevalence of firearms in the gang. He, like many members, had a personal gun and access to gang or "hood" guns that were passed around amongst members. If a Sureño did not have a gun, he could get one from another member. As a VLT member, Lomeli saw more than 10 guns. He borrowed a gun from a fellow gang member to commit crimes for the gang and witnessed other members borrow guns to commit crimes.

Lomeli knew Gonzalez was a VLT or Poco Way Sureño in 2012. Lomeli was present at VLT meetings with Gonzalez and used to hang out with Gonzalez and other members. Gonzalez's nickname was "Shy Boy." The "P" tattoo on Gonzalez's arm stood for Poco Way, and the three dot tattoo on his elbow signified Sureño gang membership.

9

Lomeli dropped out of the gang in March 2013, when he was in custody. He remained in protective custody for about a month before he was released. His fellow Sureño members did not know he had dropped out.

B. *Lomeli's Percipient Witness Testimony*

After questioning Lomeli about being a Sureño, the prosecutor questioned him about events occurring in 2012 and 2013. The prosecutor asked Lomeli about the shooting of Heredia, and Lomeli said Heredia was a Norteño in the Meadowfair gang. Lomeli and some other Sureños were standing in front of a neighborhood store when Gonzalez drove up in his Eclipse. Gonzalez told them he shot somebody and asked for their help in looking for expended shells in his car. Lomeli testified he found two shells; however, in a prior statement to the police, he said he did not find any. Gonzalez was armed with "a Narco gun" that had a chrome handle and a design or engravings on the barrel. It was different than the one linked to the Heredia and Joya shootings. There was a passenger in Gonzalez's car, but at trial, Lomeli could not remember who it was. Lomeli previously told the police the passenger was a gang member whose moniker was "Psycho," and he was also armed with a handgun. When Lomeli was in custody with Gonzalez, Gonzalez told him the day Lomeli helped him look for expended shells in the Eclipse was the day he shot Heredia and Heredia was riding a scooter when he shot him. Lomeli had seen Gonzalez in possession of three different guns on five different occasions.

Lomeli did not personally know Cortez but had heard of him and knew he was a Norteño. When Cortez was shot, Lomeli had already dropped out of the gang, but Gonzalez and others did not know he had left the gang. The day after Cortez was killed, Gonzalez visited Lomeli at his house and had dinner with Lomeli's family. When they were outside, Gonzalez told Lomeli he had been driving his car when he saw Cortez and another Norteño. Gonzalez believed they were going to shoot him, so he shot them first. Gonzalez told Lomeli someone was in the car with him when the shooting occurred, but

10

Gonzalez did not want to name the person. Gonzalez was driving Sister's Altima the day he visited Lomeli and explained he was doing so because his car was "hot."

X. *Gang Expert Testimony*

Detective Elizabeth Ramirez testified as an expert on criminal street gangs. She testified a Sureño is a criminal street gang member in San Jose and the Sureño gang identifies with the color blue and the numbers 1, 3, and 13. Norteños, their rivals, identify with the color red and the number 14. The primary activities of the Sureño gang in San Jose are assaults, robberies, and stealing cars. Ramirez explained it is crucial for gangs to instill fear in others to deter rivals from attacking and prevent people from reporting their crimes and cooperating with the police. If a Sureño kills a Norteño, it benefits the Sureño gang as a whole and the shooter's Sureño subset because it shows the gang is "a force to be reckoned with" and instills fear. Killing a Norteño also enhances the shooter's standing amongst the gang's other members. Ramirez testified a gang member might dress in rival gang colors to facilitate an attack as it allows him to get closer to his target undetected and confuses law enforcement investigating the crime.

VLT, also known as Poco Way, is a Sureño subset in the Poco Way neighborhood. Ramirez testified Gonzalez's tattoos indicated he was associated with Poco Way Sureños. Based on her training and experience and Lomeli's testimony, Ramirez opined Gonzalez was a member of the VLT/Poco Way criminal street gang. Ramirez also opined Cortez was a member of the Norteño gang subset Capitol Park Locos and Joya was associated with the Norteño subset West Side Mob. Heredia was killed in the territory of the Norteño subset Varrio Meadowfair. Although Ramirez did not believe Heredia was a gang member, Velasquez, his companion, was and was wearing Norteño colors at the time of the shooting. When given hypotheticals based on the facts of each shooting in this case, Ramirez opined the shootings benefited the Sureño gang.

11

DISCUSSION

I. *Denial of Mistrial Motion*

Gonzalez contends the trial court erred by denying his motion for a mistrial after the prosecutor elicited testimony from Lomeli regarding an uncharged shooting. The Attorney General responds the court properly concluded the brief reference to the uncharged shooting was curable, struck the testimony, admonished the jury, and denied the motion. We agree with the Attorney General.

A. *Background*

On direct examination, Lomeli testified Gonzalez made statements to him regarding shooting Norteños at Capitol Park and shooting Heredia on a scooter. Testifying about Gonzalez's involvement in Heredia's murder, Lomeli said Gonzalez arrived in his Eclipse, said he shot someone, and asked Lomeli and other Sureños to help search his car for expended shell casings. The prosecutor asked Lomeli how many shootings he knew Gonzalez had committed aside from shooting Heredia and Cortez. Lomeli answered, "I know about one more." The prosecutor inquired, "What was the other one?" and Lomeli responded, "It was right there on Bonita and 33rd." The prosecutor repeated Lomeli's answer but in question form, "Bonita and 33rd?" and Lomeli repeated his answer, "Bonita and 33rd."

Defense counsel objected and requested a side bar. The court held an initial, unreported sidebar conference before excusing the jury. Outside the presence of the jury, the court indicated defense counsel requested a hearing because Lomeli's testimony concerned an uncharged shooting. Defense counsel requested "anything on the record" be stricken, the jury be admonished, and the prosecutor instructed not to question the witness further regarding the uncharged incident.

The prosecutor denied knowing Lomeli had information about an uncharged shooting and stated he thought Gonzalez may have told Lomeli about shooting Joya. Defense counsel asserted the prosecutor's explanation was doubtful because

12

Lomeli had denied any knowledge of the Joya shooting when the police interviewed him. Defense counsel argued the prosecutor had engaged in an "incredibly prejudicial" "fishing expedition" that left the jury with the impression Gonzalez was involved in another shooting, and defense counsel requested the court declare a mistrial. The prosecutor responded there was no basis for either striking the testimony or declaring a mistrial and argued defense counsel intentionally failed to object to his question so she could request a mistrial. The prosecutor indicated in questioning Lomeli about another shooting, he was trying to rectify some confusion in Lomeli's testimony regarding the time of day the shooting occurred. The prosecutor believed Lomeli may have been referring to the Joya shooting rather than the Heredia shooting.

The court permitted the parties to question Lomeli outside the presence of the jury to determine whether his testimony was related to the Joya shooting. Lomeli testified he knew nothing about the Joya shooting and clarified the shooting at Bonita and 33rd Avenue was unrelated to the charged incidents. The court precluded any questions concerning the uncharged shooting. The court denied the mistrial motion because the testimony concerning the uncharged shooting was brief and it did not rise "to the level of a mistrial."

When the jury returned, the court admonished it as follows: "There was a question and answer immediately prior to the break related to 33rd Avenue. That answer has been stricken, and the question has been stricken. And you're not to consider that for any purpose." There was no further testimony concerning this uncharged shooting. After the close of the evidence, the court instructed the jurors to disregard any testimony stricken from the record and not to consider it for any purpose. (CALCRIM No. 222.)

B. *Applicable Law*

"'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested

13

with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.) We apply the deferential abuse of discretion standard when reviewing a trial court's denial of a mistrial motion. (*Ibid.*) This means "[u]nless the trial court's ruling is '"arbitrary, capricious, or patently absurd,"' we are powerless to disturb it. [Citations.]" (*People v. Garcia* (2014) 229 Cal.App.4th 302, 311.)

C. *Analysis*

We discern no abuse of discretion in the trial court's decision to deny Gonzalez's motion for a mistrial. Based on the evidence before the jury, the court could reasonably conclude the brief reference to another shooting did not irreparably damage Gonzalez's chance of receiving a fair trial and any damage could be cured by striking the testimony and admonishing the jury. (See *People v. Price* (1991) 1 Cal.4th 324, 428 [concluding denial of mistrial motion not abuse of discretion where witness's reference to polygraph was brief and court admonished jury to disregard testimony].)

"'Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured. [Citations.]' [Citation.]" (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1428-1429 (*McNally*).) That is exactly what occurred here. The court told the jury the prosecutor's question and Lomeli's answer concerning a shooting at 33rd Avenue had been stricken, and the court admonished the jury not to consider it "for any purpose." "'We presume that jurors understand and follow the court's instructions[.]' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005 (*Hovarter*).) "'It is only in the exceptional case that "the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions." [Citation.]' [Citation.]" (*McNally, supra*, 236 Cal.App.4th at p. 1429.) This is not such a case. The court's admonishment was sufficient to cure any prejudice to Gonzalez.

14

Gonzalez contends "[n]o reasonable jury could have followed the court's instruction to disregard evidence of a third murder." Gonzalez misreads the record. The prosecutor asked Lomeli if he knew "how many other shootings" Gonzalez had committed. The prosecutor did not ask Lomeli about a third murder, and Lomeli did not testify to such. Gonzalez is not entitled to relief on this claim.

## II. *Lomeli as a Witness*

Gonzalez presents three interrelated attacks on the court's admission of Lomeli's testimony. First, he argues the court abused its discretion by permitting Lomeli to testify as an expert on the Sureño gang because he "lacked any qualifications to be a gang expert." Second, he contends his Sixth Amendment right to confrontation was violated because permitting Lomeli to testify as an expert "enabled the prosecutor to use him as a conduit for raw hearsay." Third, he asserts, "[b]y presenting Lomeli as both a fact and expert witness, the prosecutor improperly vouched for Lomeli's credibility, both by giving him an undeserved status of 'expert witness' and by having a police gang expert bolster Lomeli through her own testimony agreeing with him." (Boldface omitted.) Gonzalez's first two arguments are forfeited, and all are without merit.

## A. *Background*

Informed the prosecution sought to have Lomeli testify as a gang expert and a percipient witness, the defense moved prior to trial to preclude or limit Lomeli's "'dual role'" witness testimony. The defense asserted permitting Lomeli to testify as both a percipient and expert witness "implicitly vouche[d] for the fact-witness portion [of] his testimony" and the jury would have difficulty differentiating Lomeli's fact-based testimony from his expert testimony. (Boldface and capitalization omitted.) The court denied the motion, explaining Lomeli could testify as "an expert witness based on his own experiences within the gang and also as a percipient witness in [the] case."

In the first part of his trial testimony, Lomeli testified about his experience as a Sureño in VLT or Poco Way. He described the gang's colors, territory, history,

15

culture, and their rivals, Norteños.  During this portion of Lomeli's testimony, the prosecutor asked what would happen to a Norteño if he was in custody and placed in the same housing unit as Sureños.  Defense counsel objected on the grounds of lack of foundation as an expert and speculation.  The court overruled both objections.  The prosecutor requested Lomeli "be permitted to testify as an expert in criminal street gangs, specifically Sureño and Norteño."  The court asked defense counsel if she wished to voir dire the witness, and defense counsel responded the prosecutor had not laid a foundation as to Lomeli's expertise concerning Norteños.  The court indicated if defense counsel was objecting to the witness's designation as an expert, she could voir dire the witness.  Defense counsel responded she would "deal with it on" cross-examination.  The court designated Lomeli an expert on Sureño gangs.  In the second part of his testimony, Lomeli testified as a percipient witness, describing his interactions with Gonzalez after the Heredia and Cortez shootings.

## B.  *Lomeli's Expert Testimony*

Gonzalez contends the trial court abused its discretion by designating Lomeli as a gang expert.  The Attorney General argues Gonzalez forfeited his appellate challenge by failing to object below, and even if the claim was preserved, it fails on its merits because the court properly determined Lomeli was qualified to testify as an expert on the Sureño gang based on his experience with it.  We agree with the Attorney General.

## 1.  *Forfeiture*

As the Attorney General points out, Gonzalez did not object in the trial court to Lomeli's designation as an expert witness on the Sureño gang.  The "failure to specifically object to an expert's qualifications forfeits the [issue on appeal]."  (*People v. Morales* (2020) 10 Cal.5th 76, 98 (*Morales*).)  In his reply brief, Gonzalez asserts his claim Lomeli was not qualified to testify as an expert witness was preserved because his counsel objected in the motion in limine to Lomeli being permitted to testify as both a lay and expert witness.  We disagree.  It is well established an evidentiary objection on one

16

ground does not preserve an appellate claim on a different ground. (*People v. Marks* (2003) 31 Cal.4th 197, 228.) The arguments Gonzalez made in his in limine motion do not preserve his appellate claim because he did not seek exclusion of Lomeli's testimony on the ground Lomeli was unqualified to testify as an expert on the Sureño gang. (See *Morales, supra*, 10 Cal.5th at p. 98 [although defendant objected to witness's testimony on other grounds, failure to object on basis of witness's qualifications forfeited issue].) Thus, Gonzalez forfeited his appellate challenge. (See *People v. Townsel* (2016) 63 Cal.4th 25, 46 [concluding defendant's failure to object to witness's expertise forfeited claim court abused its discretion permitting witness to testify as expert].)[4] Nevertheless, even assuming Gonzalez preserved his claim for review, it is without merit.

2. *No Abuse of Discretion*

Gonzalez contends the trial court abused its discretion by permitting Lomeli to testify as an expert because he "lacked any qualifications to be a gang expert." (Boldface omitted.) The Attorney General argues the court properly permitted Lomeli to testify as an expert on the Sureño gang based on his experience with and knowledge of the gang. We agree with the Attorney General.

Evidence Code section 720, subdivision (a), states, "[a] person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education

---

[4] Addressing the Attorney General's forfeiture argument, Gonzalez contends in his reply brief "it is clear that trial counsel argued that Lomeli was completely unqualified to testify as a gang expert." But Gonzalez fails to provide us with any citation to the record supporting this contention, and we have not found such clarity in our review of the record. "'It is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations.' [Citations.] If a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived. [Citation.]" (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.)

In our review of the record, we found the defense objection to Lomeli's qualifications as an expert on the Norteño gang. We did not find an objection Lomeli was completely unqualified to testify as an expert on the Sureño gang.

sufficient to qualify him as an expert on the subject to which his testimony relates." If a party objects, the witness's "special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (*Ibid.*) "'Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications.' [Citation.]" (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115.)

"'"The trial court's determination of whether a witness qualifies as an expert is a matter of discretion and will not be disturbed absent a showing of manifest abuse."' [Citation.] We find such abuse only where '"'"the evidence shows that a witness *clearly lacks* qualification as an expert."'"' [Citation.] '"'"Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than to its admissibility."'"' [Citations.]" (*Morales, supra*, 10 Cal.5th at p. 97.)

Gonzalez asserts Lomeli was not qualified to be an expert witness because there was no evidence Lomeli had any specialized education or training. Gonzalez proclaims, "[c]ourts typically require some extent of formal education and training in the area of expertise, not simply experience." He is mistaken.

There is no requirement a witness receive formal education or training on a topic to qualify as an expert witness on it. "Expertise . . . 'is relative to the subject,' and is not subject to rigid classification according to formal education or certification. [Citation.]" (*People v. Ojeda* (1990) 225 Cal.App.3d 404, 408.) "Rather, an expert's qualifications can be established in any number of different ways, including 'a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion.' [Citation.] In sum, with respect to expert qualification, '[t]he determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and no hard and fast rule can

18

be laid down which would be applicable in every circumstance.' [Citations.]" (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 294 [concluding court abused its discretion by refusing to qualify witness as an expert (*id.* at p. 296) based on witness's lack of formal education and membership in professional organizations (*id.* at pp. 293-294)].)

We conclude the trial court did not abuse its discretion by permitting Lomeli to testify as an expert on the Sureño gang based on his seven years of personal experience as a Sureño in VLT. Lomeli testified about his own experiences in the gang, as well as the gang's culture—its colors, symbols, history, and neighborhoods. He did not need training or classes in Sureño gang culture and lifestyle to learn about it; he lived it. Given Lomeli's experience as a Sureño gang member, we cannot say he clearly lacked qualifications to testify as an expert on the Sureño gang.

Gonzalez asserts Lomeli was not qualified to be an expert witness on the Sureño gang because the evidence showed Lomeli was only "an ordinary, low level member of the VLT subgroup." Lomeli's expert testimony was consistent with his status in the gang. Moreover, Gonzalez's complaint goes to the weight of Lomeli's expert testimony, not its admissibility. (*Morales, supra*, 10 Cal.5th at p. 97.)

C. *Dual Role Witness*

Next, Gonzalez contends by permitting Lomeli to testify as an expert, the trial court allowed him "to act as a conduit for raw hearsay" in violation of Gonzalez's constitutional right to confrontation. Gonzalez makes this broad contention but does not provide any factual support for it. As the Attorney General points out, Gonzalez "does not identify any particular hearsay statements that were purportedly improperly funneled to the jury through Lomeli's testimony. Nor does [Gonzalez] point to any specific statements or opinions by Lomeli that purportedly violated his confrontation rights." Even after this deficiency was pointed out by the Attorney General, Gonzalez did nothing to remedy it in his briefing.

19

"'The appellate court is not required to search the record on its own seeking error.' [Citation.] Thus, '[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived. [Citation.]' [Citations.]" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Gonzalez has not pointed us to any portion of Lomeli's testimony that was an improper conduit for hearsay. Thus, he has forfeited his claim as we will not search the transcript for support when he has failed to do so.

C. *Improper Vouching*

Gonzalez contends the prosecutor improperly vouched for Lomeli's credibility by presenting him as both a lay and expert witness. We disagree.

A prosecutor does not vouch for a witness's credibility by simply calling him as a witness. "'Impermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.' [Citation.]" (*People v. Rivera* (2019) 7 Cal.5th 306, 336.) The prosecutor did no such thing here. We discern no vouching by the prosecutor in treating Lomeli as both a percipient and expert witness.

Moreover, the jury was instructed it alone was responsible for judging the credibility and believability of the witnesses (CALCRIM No. 226). CALCRIM No. 226 listed several factors for the jury to consider in evaluating a witness's credibility and deciding whether to believe all, part, or none of a witness's testimony. The fact the witness testified as both a lay and expert witness was not one of those factors. The jury was also instructed on how to evaluate the believability of an expert witness, including considering the expert's knowledge, skill, and experience (CALCRIM No. 332). The court's instructions, as a whole, would not permit the jury to believe Lomeli's testimony as a percipient witness just because he testified as an expert. We presume the jury understood and followed the court's instructions. (*Hovarter, supra*, 44 Cal.4th at

20

p. 1005.) Thus, we are satisfied the jury was capable of properly evaluating Lomeli's testimony.

III. *Accomplice Instruction*

Gonzalez asserts there was significant evidence Lomeli was an accomplice to the Heredia shooting, and therefore, the trial court erred by failing to sua sponte instruct the jury on accomplice testimony (CALCRIM No. 334). We disagree. We conclude the trial court did not error because the evidence was insufficient as a matter of law to support a finding Lomeli was an accomplice to Heredia's murder.

A. *Applicable Law*

A criminal conviction cannot stand "upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." (§ 1111.) Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." "'To be chargeable with an identical offense, a witness must be considered a principal under section 31.' [Citations.]" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1155 (*Johnsen*).) "That statute defines principals to include '[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . .' [Citations.]" (*People v. Horton* (1995) 11 Cal.4th 1068, 1113-1114 (*Horton*).) "An accomplice must have '"guilty knowledge and intent with regard to the commission of the crime."' [Citations.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 302 (*Gonzales and Soliz*).) "A mere accessory, however, is not liable to prosecution for the identical offense, and therefore is not an accomplice. [Citations.]" (*Horton, supra*, 11 Cal.4th at p. 1114.)

"Only when there is 'substantial evidence that a witness who has implicated the defendant was an accomplice' must the trial court instruct on 'the principles regarding

21

accomplice testimony.'  [Citations.]"  (*Johnsen, supra*, 10 Cal.5th at p. 1155.)  "Substantial evidence is 'evidence sufficient to "deserve consideration by the jury," not "whenever *any* evidence is presented, no matter how weak."'  [Citation.]"  (*People v. Lewis* (2001) 26 Cal.4th 334, 369.)  "'"[I]f the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony."'" [Citation.]"  (*Johnsen, supra*, 10 Cal.5th at p. 1155.)

B.  *Analysis*

Gonzalez contends evidence Lomeli assisted him in searching for and, presumably, disposing of expended shell casings after the Heredia shooting was sufficient to require the court to sua sponte instruct the jury on accomplice testimony.  Gonzalez is mistaken.

Lomeli's conduct after Heredia's murder might have implicated him as an accessory, but his conduct would not subject him to accomplice liability for murder.  A witness's "assistance in disposing of evidence of the various crimes makes him, at most, an accessory after the fact; a mere accessory is not an accomplice."  (*People v. Balderas* (1985) 41 Cal.3d 144, 193; accord *Horton, supra*, 11 Cal.4th at pp. 1114-1116 [evidence of witness's conduct after commission of crimes, including retrieving criminal proceeds and driving defendant to bus stop, did not subject him to accomplice liability].)  Nor did Lomeli's involvement in the same criminal street gang make him an accomplice to Heredia's murder, as Gonzalez contends it does.  Because the evidence was insufficient as a matter of law to support a finding Lomeli was an accomplice, the court's failure to give CALCRIM No. 334 was not instructional error.

IV.  *Admission of Sister's Police Interview*

Gonzalez contends Sister's statements to the police were the involuntary product of coercive police interrogation and their admission at trial violated his due process rights under the state and federal Constitutions.  We disagree.

22

A. *Police Interview*

After Cortez was killed and Gonzalez was arrested, the police called Sister to come and retrieve her Altima. Detectives Guire and Tran interviewed Sister at the police station for about five hours.

At the beginning of the interview, Sister told the detectives the day Cortez was shot in Capitol Park, she was driving the Challenger while running errands with her mother. She said Gonzalez was home when she left around 2:00 p.m. and still home when she returned at 8:00 p.m. The detectives told Sister they could easily prove who was driving the car on the day of the shooting and warned her not to get herself in trouble to protect Gonzalez, her younger brother. They urged her to be completely honest with them. They asked who was driving the Challenger and warned Sister if she lied to help her brother, she would get herself in trouble. The detectives explained to Sister her brother had been arrested for a homicide at Capitol Park. They said they knew Gonzalez was driving the car, not her. When Sister again proclaimed she was driving the car the day of the shooting, Guire told her she had to decide whether she was going to "throw [herself] under the bus for her brother." He then stated, "At the end of the day, you're gonna walk out of here but realize that you're gonna own the statement here. Okay? Because I'm gonna come through with a wrecking ball at the other end because if you're bullshittin' me and you tell me lies to cover [for] him, I will run you over."

Sister maintained she was driving the Challenger the day of the shooting and was not lying to the detectives. Guire told her it was the same paperwork to put her in jail as to not. He tried talking to her and said he hoped something he said made her realize her brother was "not worth it." Guire told Sister to consider her brother had been arrested for homicide and "the penalty for homicide is" electrocution or "a lot of years in jail." He explained they had evidence Gonzalez was driving the car when Cortez was shot.

23

Guire endeavored to build Sister's trust and told her to be truthful. Sister's initial story began to shift. She said the Challenger was at the house the day of the shooting but she did not know if or when Gonzalez took it because she was not home until later and she took the Challenger to work around 7:00 p.m. As the interview continued, Guire warned Sister she was "placing [herself] in a very, very, very tight box" by being untruthful and continuing to say she drove the car. He stated, "aid and abetting a homicide is almost like committing the homicide yourself." Guire told Sister, "I'm not gonna put this on you. But I am going to press you because I don't want you to own something that [Gonzalez] needs to own." Guire asked Sister to consider what would happen to her family if she was taken away from them for two weeks or four months and whether they would be able to pay their rent and live in the same place. Guire explained Gonzalez was "done" but she did not have to go down with him. Guire inquired if Gonzalez asked her to cover for him. Sister denied Gonzalez told her anything. She said Gonzalez drove the Challenger some that day, but she did not know what time. When she went to leave around 7:00 p.m., she realized Gonzalez had taken the Altima and left her the Challenger.

Guire asked Sister why she initially lied to them about driving the car all day. Sister said she did because she was scared and wanted to protect her brother. She denied Gonzalez asked her to lie for him. Guire responded that if Gonzalez did not ask her to lie then she was the "mastermind" of the lie. When Sister asked, "what do you want me to tell you?" Guire responded, "I want you to tell me the truth. I want you to tell me the truth." Sister said she was scared because she had never been in trouble. Guire reiterated he knew she was not involved in the homicide. He said he had talked to Gonzalez and knew Gonzalez had a conversation with Sister. Guire urged Sister to think about her family, telling her, "You shoulder it all [for your family]. You carry it. You can't carry this one. This one's way too big. [pause] Tell me about the conversation.

24

Tell me why you lied. [pause] You can't carry it." Sister admitted when Gonzalez got home the night of the shooting, he told her to drive the Challenger.

Sister denied knowing anything else. Guire said, "I'll be here all night." Sister responded, "But I have to go to work. [¶] . . . [¶] I have to go to sleep." She explained her parents were waiting outside and they were tired also. Guire reminded Sister she was free to leave at any time.

Sister stated she lied because she was scared and knew Gonzalez was in "big trouble." Guire encouraged Sister to tell the truth and reassured her that she would not get in trouble for doing so. He told her, "You're not gonna get in trouble if you're truthful." After several long pauses, Sister said she did not want to go to jail and complained her head hurt already. She stated Gonzalez told her "his friends got in trouble" but he did not tell her why. She assumed Gonzalez was with them and she lied about driving the car because she wanted to protect him. She conceded she could not say she was driving the car when she was not.

Sister was left alone in the interview room for about six minutes while the detectives took a bathroom break. When Guire returned, he told Sister that he believed she knew more about Gonzalez's involvement. Sister said she had already disclosed what she knew. When Guire asked Sister to reexplain it for his partner, Sister said she wanted to leave. Guire reminded Sister she was free to leave any time she wanted. Sister said she wanted to go because she was tired and had already told them what she knew. Tran stood up and said, "Okay come on we'll get you out of here." Sister walked to the door. Guire asked Sister if she wanted some water to go. She declined the water but said she needed to use the restroom.

About five minutes later, Sister returned to the interview room with Tran. He then left Sister alone in the interview room. During this time, Sister spoke to her father by telephone, telling him the police were interrogating her and if she did not answer their questions, they would arrest her the next day. When Tran returned, he asked

25

her if she understood how important it was for her "to be a hundred percent truthful and honest" with them. He reminded her that she was not under arrest and was free to leave any time she wanted. He then requested she tell him everything "this one last time."

Sister went through the events of the day Cortez was killed, saying she got home around 6:00 p.m. Gonzalez came home in the Challenger within an hour. When she went to leave about 7:00 p.m., she discovered Gonzalez had taken the Altima without telling her. She called him and he told her to drive the Challenger. He later told her that he was scared because one of his friends had messed up by shooting someone.

Tran told Sister that she needed to take care of herself and expressed his belief she had not been completely truthful with him. He continued, "I don't have any more time to sit here and just wait for when you decide when. I thought you made that decision already. Apparently you haven't. 'Kay I'm not gonna force you. Okay?" Sister stated she wanted to help but did not want to get in trouble. Tran responded, "You're not . . . helping. I don't need your help. . . . I'm giving you . . . an opportunity to help yourself. Okay it's not about helping me, it's not about helping my partner or helping your brother. It's about you helping yourself. You need to realize that. Okay? It's not about helping anybody here but you. And I don't wanna stay any longer than I . . . have to." Sister asked what else he wanted to know. After looking at Sister's text messages with Gonzalez, Tran told her it was easy for him to prove her lies. He said, "You got about five more minutes with me and that is it. I have no more patience for you."

Sister told Tran he made her nervous. Tran responded, "Don't give me this bullshit, I'm scared, I'm nervous. You either talk to me right now or I'm out of here. I don't have time for this. Do you understand?" After Sister responded affirmatively, Tran continued, "Okay. Let me know when you're ready to talk if not, let's get out of here. Let's not waste time I'm done." Sister said she did not want to waste time. Tran told her that he did not have time to play games and she either needed to tell him the truth or not

26

talk to him. He said he would have Guire come back in and Sister could talk to him and tell him "everything."

Tran left the room briefly and returned with Guire. Tran asked Sister, "Okay are we gonna do this?" and she responded, "I want to do this." He told her to start when she was ready and to give them "a hundred percent truth." Sister said the day Cortez was killed, that night she heard Gonzalez talking to his friends on his phone and he asked one of them about spending the night at their house. Gonzalez told Sister he was scared and did not want to stay home because they were going to come looking for him. He said he did not do anything but his friend "fucked up" and shot a person. He told her to drive the Challenger and "clean it."

Guire asked what Gonzalez meant by cleaning the car and Sister said she thought he meant wash it so she took it to a car wash. Guire did not believe her. Guire said Gonzalez wanted her to drive the car and get stopped in it so people would believe she was driving and he was not. He told her, "This is how serious we are, you have information about a homicide and actively assist him in covering it up." He asked her if she wanted him to bring in some handcuffs so she could feel them "because they are scary."

Tran said he knew Gonzalez came home and told her that he shot somebody but Sister was afraid to tell them because she did not want to get in trouble or get her brother in trouble. Practically yelling at Sister, Tran asked if she wanted to "go inside" with Gonzalez. When Sister said she did not, Tran told her to tell them the truth, "Please." Sister sighed and said Gonzalez told her that he was in the car when his friends shot a person. Tran accused Sister of lying when she said Gonzalez told her that his friends shot someone. Guire told Sister she was "so hosed." He continued, "You're in a lot of trouble. I'm not screwing around either. It's not like the last time. . . ." Sister asked if everything she said would be on her brother. Guire responded better Gonzalez than her and urged her to "spit it out." She asked if she told them what she knew was she

27

going to "be out of this problem." Tran responded she needed to think for herself and the rest of her family. Sister said the day after Cortez was killed, Gonzalez told her three guys tried to shoot him so he took out a gun and shot at them.

B. *Proceedings in Trial Court*

Prior to trial, the defense moved in limine to suppress Sister's statements to the police implicating Gonzalez in Cortez's murder. The defense asserted Sister's statements were inherently unreliable as they resulted from police coercion. After reviewing the recording of Sister's police interview, the trial court denied the motion, finding there was no coercion and her statements were voluntary.

At trial, Sister testified she did not recall anything she said during her police interview. Over defense objection, the court permitted the prosecution to play the video recording of Sister's police interview in its entirety as a prior inconsistent statement. (Evid. Code, § 1235.)

C. *Applicable Law*

When seeking to exclude a witness's pretrial statements obtained through unlawful police coercion, the defendant must prove the unlawful coercion. (*People v. Lee* (2002) 95 Cal.App.4th 772, 788 (*Lee*).) If successful, the evidence is excluded as "'inherently unreliable'" (*ibid*.) "to assure the reliability of the trial proceedings. . . .'" (*Id.* at p. 782, fn. omitted.) A witness's statement is coerced if it is the product of police conduct that overcomes the person's free will. (*Ibid*.)

The rules that apply when the police obtain a confession from an accused, also apply when they obtain a statement from a witness. (*Lee, supra*, 95 Cal.App.4th at p. 785.) In determining whether a statement was voluntarily made, we consider "the totality of all the surrounding circumstances," including the person's characteristics and "details of the interrogation." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226; *People v. Neal* (2003) 31 Cal.4th 63, 79.) Factors relevant to this determination include the person's "youth, inexperience, minimal education, . . . low intelligence[,]" deprivation

28

of food or drink, deliberate violation of the dictates of *Miranda v. Arizona* (1966) 384 U.S. 436, and repeatedly accusing the person of lying. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1078 (*Nguyen*).)

"'A statement is involuntary [citation] when, among other circumstances, it "was '"extracted by any sort of threats . . . , [or] obtained by any direct or implied promises, however slight . . . .'"'" [Citations.]" (*Nguyen, supra*, 61 Cal.4th at p. 1078.) "'However, mere advice or exhortation by the police that it would be better for the [witness] to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent [statement] involuntary. . . . Thus, "[w]hen the benefit pointed out by the police to a [witness] is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.]'" (*People v. Holloway* (2004) 33 Cal.4th 96, 115.)

Where, as here, the facts concerning the alleged coercion are undisputed, we review the record de novo to determine whether Sister's statement was voluntary under the totality of the circumstances. (*Lee, supra*, 95 Cal.App.4th at p. 781.)

D. *Analysis*

Having reviewed Sister's police interview and looking at the totality of the circumstances, we conclude her statements were voluntary and not induced by police misconduct. Initially, we note the absence of a key fact—Sister never testified her statements were coerced. At trial, she claimed she did not recall what she told the police. She also testified she had no reason to lie to the police during her interview. This weighs heavily in favor of finding Sister's statements were not coerced.

Gonzalez contends Sister's statements to the police were coerced because: (1) Guire warned her that she could be prosecuted for aiding and abetting the commission of a homicide based on her attempt to create a false alibi for Gonzalez; (2) Guire told her the penalty for homicide was death by electrocution or a lot of years; and (3) Guire threatened to arrest her if she did not give a statement implicating him as Cortez's

29

murderer.  Gonzalez's characterization of the interview is not supported by the record.
The detectives did not threaten to arrest Sister if she failed to give a statement implicating
her brother as Cortez's murderer.  They urged her to tell the truth and cautioned her that
she could get in trouble if she did not, but they did not threaten to arrest her.  In fact, they
told her at least twice during the interview she was not under arrest and was free to leave
anytime she wanted.

Guire did tell Sister the penalty for homicide was death by electrocution or
a lot of years in jail, but he did not *threaten* her with the death penalty.  Guire's reference
to the death penalty came after he told Sister that Gonzalez had been arrested for Cortez's
homicide and they had evidence he was driving the car when Cortez was shot.  Moreover,
a "mere '[r]eference to the death penalty does not necessarily render a statement
involuntary.'  [Citation.]"  (*People v. Winbush* (2017) 2 Cal.5th 402, 453 (*Winbush*).)
Although Guire told Sister that aiding and abetting a homicide was "almost like
committing the homicide," he immediately followed that statement by telling her, "I'm
not gonna put this on you."  At different points in the interview, Guire told Sister he
knew she was not involved in the homicide.

The detectives did not promise Sister anything if she implicated her brother.
After Sister claimed she was driving the car, not Gonzalez, the day Cortez was killed, the
detectives urged her to tell the truth.  Once she admitted to lying about driving the car,
they pressed her hard to find out why she tried to create a false alibi for her brother.

The circumstances surrounding Sister's police interview do not compel us
to conclude her statements were coerced by the detectives.  Sister went to the police
station with her parents for the purpose of retrieving her car.  Sister indicated she
understood she was not under arrest. The interview lasted about five hours.  While long,
the length of the interview was not excessive given the nature of the case.  (See *Winbush,
supra*, 2 Cal.5th at p. 454 [six-hour interrogation not coercive].)  The detectives twice
paused the interview so Sister could talk on the telephone to her father, who was waiting

outside. They also paused the questioning for bathroom breaks and offered Sister water more than once. It is true Sister had no prior experience with the criminal justice system. But the record does not show she was vulnerable to police coercion. (See *People v. Boyette* (2002) 29 Cal.4th 381, 411 [maturity is a factor considered in determining voluntariness of statement].) Sister was responsible and hardworking. She worked two jobs to help her family financially. And there was no evidence she had low intelligence. While the detectives impressed upon Sister how serious the situation was and repeatedly and sometimes loudly pressed her to tell the truth, their questioning was not coercive.

Gonzalez misplaces his reliance on *People v. McClary* (1977) 20 Cal.3d 218 (*McClary*), overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 510, fn. 17, as *McClary* is factually distinguishable. In *McClary*, officers ignored repeated requests for counsel from the 16-year-old suspect, falsely told her she would face the death penalty unless she changed her statement, and implied she would only be charged as an accessory is she admitted "'knowledge'" of the murder. (*Id.* at p. 229.) Here, Sister was neither a minor nor did she request the assistance of counsel at any time during the interview. The detectives never threatened her with the death penalty. Nor did the police promise a particular charge or other lenient treatment in exchange for her cooperation.

In summary, we conclude the detectives did not cross the line from proper exhortations to tell the truth into impermissible threats of punishment or promises of leniency when interviewing Sister. Accordingly, the court properly admitted Sister's police interview.

V. *Cumulative Error*

Gonzalez contends his due process right to a fair trial was violated because of the cumulative effect of the trial court's alleged errors. We disagree.

A claim of cumulative error is essentially a due process claim, and the test is whether the defendant received a fair trial. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) "In theory, the aggregate prejudice from several different errors occurring

31

at trial could require reversal even if no single error was prejudicial by itself." (*In re Reno* (2012) 55 Cal.4th 428, 483.) However, where an appellate court has found no error in rejecting each of a defendant's claims, no cumulative error can be found. (*Ibid.*) Here, Gonzalez's cumulative error claim is without merit because we have rejected all his individual claims. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].)

VI. *AB 333*

AB 333, enacted while this appeal was pending, made substantive changes to section 186.22 and procedural changes by adding section 1109.[5] Newly added section 1109, subdivision (a), requires gang enhancements charged under section 186.22, subdivision (b) or (d), be bifurcated from the underlying charges at defense request. (Stats. 2021, ch. 699, § 5.) The statute is silent as to whether it applies retroactively or prospectively only.

Gonzalez notes prior to his trial he requested the gang enhancement allegations be bifurcated, but the court denied his request under discretion it had at the time. He contends section 1109's bifurcation provisions apply retroactively to his case based on *In re Estrada* (1965) 63 Cal.2d 740 and its progeny and require the reversal of his convictions and enhancements. The Attorney General responds section 1109 applies prospectively only because it concerns trial procedure and does not alter the substantive requirements of the gang enhancement. We need not and do not decide whether section 1109 operates retroactively because even if we assume it does, Gonzalez cannot demonstrate "it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)" (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480 (*E.H.*).)

---

5        Because Gonzalez does not make any argument concerning the changes to section 186.22, we do not address them here.

Recently, our colleagues in *E.H.* considered the same issue—whether retroactive application of section 1109 required reversal of defendant's charges—and stated, "when the evidence of guilt on the relevant charges is 'overwhelming,' . . . it is unlikely the defendant was harmed by the format of the trial. [Citation.]" (*E.H., supra*, 75 Cal.App.5th at p. 480.) The *E.H.* court concluded the failure to bifurcate was harmless because the jury's verdict was not based on improper bias but was based on strong evidence defendant committed the charged offenses. (*Ibid.*) We reach the same conclusion here. Indeed, given the strength of the evidence, we conclude the failure to bifurcate was harmless under the standards for state law error in *Watson* and federal constitutional error in *Chapman v. California* (1967) 386 U.S. 18, 24.

The prosecution presented overwhelming evidence of Gonzalez's involvement in the charged murders and attempted murder. Gonzalez admitted he was driving past when Joya was shot. His claim Joya's group shot at him, and Joya must have been hit by friendly fire was contradicted by the physical evidence. Heredia's murder occurred five days later. Gonzalez admitted to Lomeli he shot Heredia. The murder was perpetrated by the same gun used to shot Joya, and Gonzalez's white Eclipse was seen speeding away from the scene. By the time of Cortez's murder at Capitol Park, Gonzalez had switched cars and was driving a black Challenger. But again, he admitted driving by and shooting the victim, telling Pablo, Lomeli, and Sister he shot a guy when he drove by Capitol Park. Forensic evidence linked Gonzalez's Challenger with Cortez's murder through the presence of the unusual cobalt element in the gunshot residue in the car and on the two bullets recovered during Cortez's autopsy. Given the overwhelming evidence in this case, we conclude the failure to bifurcate the gang enhancement allegations was harmless.

VII. *AB 1869*

At sentencing, the trial court ordered Gonzalez to pay, among other things, a $129.75 criminal justice administration fee (former Gov. Code, §§ 29550, 29550.1,

29550.2) and $10,000 in appointed attorney costs (former Pen. Code, § 987.8). While this appeal was pending, AB 1869 was enacted, which effective July 1, 2021, eliminated a court's authority to impose these and other fees, as well as the ability to collect unpaid balances on amounts previously imposed. (Stats. 2020, ch. 92.) We conclude pursuant to AB 1869 we must vacate any unpaid balances for appointed attorney costs or the criminal justice administration fee as of July 1, 2021.

The Legislature expressly stated its intent with AB 1869 was "to eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and to eliminate all outstanding debt incurred as a result of the imposition of administrative fees." (Stats. 2020, ch. 92, § 2.) In furtherance of its intent to eliminate the costs that could be imposed and as relevant here, section 987.8, which authorized trial courts to order defendants to pay the costs of their appointed counsel under certain circumstances, was repealed effective July 1, 2021. (Stats. 2020, ch. 92, § 37.) AB 1869 also repealed Government Code sections 29550.1, 29550.2, and 29550.3, which authorized trial courts to impose a criminal justice administration fee, generally known as a booking fee (*People v. Aguilar* (2015) 60 Cal.4th 862, 865). (Stats. 2020, ch. 92, §§ 24-26.)

To eliminate outstanding debt from costs and fees imposed prior to the repeal of these statutes, AB 1869 added section 1465.9 and Government Code section 6111. Penal Code section 1465.9 provides, as relevant here, "[t]he balance of any court-imposed costs" for appointed counsel under section 987.8 as of July 1, 2021, "shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (§ 1465.9, subd. (a).) Similarly, Government Code section 6111, subdivision (a), provides, any unpaid balance for imposed criminal justice fees as of July 1, 2021, "is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."

The parties agree we should vacate the portion of the judgment imposing $10,000 in appointed counsel costs and a $129.85 criminal justice administration fee, and we concur. Under the language of section 1465.9, subdivision (a), and Government Code section 6111, subdivision (a), these costs and fees are no longer collectible as of July 1, 2021. Therefore, we vacate the unpaid balances remaining as of July 1, 2021. (*People v. Greeley* (2021) 70 Cal.App.5th 609, 626-627; *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953-954; *People v. Clark* (2021) 67 Cal.App.5th 248, 259-260.)

VIII. *Correction of Abstract of Judgment*

In our review of the appellate record, we identified a clerical error in the abstract of judgment. At sentencing, the court imposed terms of life without the possibility of parole on counts 1 and 2 and a term of life with the possibility of parole on count 3. However, these sentences are inverted in the abstract of judgment. We alerted the parties to this discrepancy, and they agree the abstract of judgment must be corrected to accurately reflect the trial court's oral pronouncement of judgment. "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls. [Citations.]" (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Pursuant to our power to correct clerical errors in the record (*People v. Jones* (2012) 54 Cal.4th 1, 89), we order the superior court to amend the abstract of judgment to state Gonzalez was sentenced to life *without* the possibility of parole on counts 1 and 2 and life *with* the possibility of parole on count 3.

DISPOSITION

The portions of (1) the appointed attorney costs imposed under former section 987.8, and (2) the criminal justice administration fee imposed under former Government Code section 29550. et seq. that remain unpaid as of July 1, 2021, are vacated. The superior court is directed to amend the abstract of judgment to reflect these modifications. The superior court is also directed to amend the abstract of judgment to reflect Gonzalez was sentenced to life *without* the possibility of parole on counts 1 and 2

35

and life *with* the possibility of parole on count 3.  Upon doing so, the superior court is directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                                    O'LEARY, P. J.

WE CONCUR:


GOETHALS, J.


ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.